**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

|  |  |
|---|---|
| SHERLEIGH ASSOCIATES LLC and SHERLEIGH ASSOCIATES INC. PROFIT SHARING PLAN, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WINDMERE-DURABLE HOLDINGS, INC., DAVID M. FRIEDSON, HARRY D. SCHULMAN and NATIONSBANC MONTGOMERY SECURITIES LLC,<br><br>Defendants. | CASE NO. 98-2273-CIV-LENARD<br>Magistrate Judge Turnoff<br><br>**NIGHT BOX**<br>**FILED**<br><br>JUN 3 0 1999<br><br>CARLOS IUENKE<br>CLERK, USDC / SDFL / MIA |

## PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, make the following allegations upon personal knowledge as to themselves, and as to all other matters, upon the investigation of plaintiffs' counsel, which included, among other things, review of public filings with the Securities and Exchange Commission ("SEC"), news reports, press releases, court filings, investigative transcripts, and contact with factual sources. Plaintiffs believe that further substantial evidentiary support exists for the allegations set forth below and will be accessible after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased the publicly-traded securities of Windmere-Durable Holdings, Inc. ("Windmere" or the "Company") between May 12, 1998 and September 22, 1998 (the "Class"), including those who acquired Windmere common stock and 10% Senior Subordinated Notes in the Company's July 22, 1998 public offering (the "Offering SubClass").  This action alleges violations of the Securities Act of 1933 and the Securities Exchange Act of 1934.

2.     Windmere is a diversified manufacturer of small electrical kitchen appliances and other household items.  In 1998, Windmere sought to enter the "big leagues," as defendant Harry D. Schulman ("Schulman") phrased it, by purchasing the assets of the Household Products Group ("HPG") of the Black & Decker Corporation ("Black & Decker").  According to Windmere, the HPG purchase would give the Company a license to use the valuable Black & Decker brand name in North and Latin American markets.

3.     Windmere acquired HPG on June 26, 1998 for $315 million in cash.  Windmere financed its purchase of HPG with a "bridge loan" from NationsBank.  To repay the NationsBank bridge loan, Windmere needed to, and did, offer its debt and equity securities to investors in a public offering on July 22, 1998 (the "July Offering").

4.     Windmere, along with the lead underwriter on the July Offering, NationsBanc Montgomery Securities LLC ("Montgomery"), offered debt and equity securities for sale to the public pursuant to a registration statement, which included the Prospectus and two Prospectus supplements (collectively, the "Registration Statement"), which was declared effective by the SEC on July 22, 1998.  (Windmere's original registration statement on Form S-3 was filed with the SEC on June 4, 1998.)  Windmere offered $103 million of common

2

stock (approximately 3 million shares at $34 per share) and a $130 million of 10% Senior Subordinated Notes. Windmere stated that the proceeds of the July Offering were to be used, in substantial part, to repay the NationsBank bridge loan. Montgomery agreed to underwrite the July Offering on a firm commitment basis. Defendants Windmere, Montgomery, David M. Friedson ("Friedson") and Schulman promoted and sold the Windmere securities by issuing positive statements in pre-offering road show presentations to investors between July 6 and July 21, 1998.

5.    In connection with the July Offering, defendants made representations of current fact that the integration of HPG was proceeding well, and that Windmere was enjoying substantial benefits from the "complementary strengths" between Windmere's existing operations and those of the recently acquired HPG. With respect to the expansion into Latin American markets which the HPG acquisition would provide Windmere, the Registration Statement stated that the Company "intended to utilize the marketing and distribution channels acquired through HPG to expand global market penetration of its products, particularly in Latin America." The Company also represented that the acquisition offered "immediate growth opportunities" and "uniquely positioned [Windmere] to capitalize on growth opportunities" in the household appliance and personal care markets. The Registration Statement also stated that by virtue of its 50% ownership in NewTech Electronics Industries ("NewTech"), the Company also recognized 50% of the net earnings and losses of NewTech and represented that it was sanguine that the existing value of such interest would not change. Defendants assured investors that Windmere continued to enjoy strong revenue growth with a decreasing cost structure -- facts that virtually ensured Windmere would post 1998 earnings per share ("EPS") of $1.50. At the time defendants

3

made these and other similar statements, however, they failed to disclose the material facts that:

- the Company did not have the requisite licenses required to operate HPG and to sell HPG products in Latin America and thus could not, until such time as the licenses were obtained, sell HPG products in Latin America or even call on HPG's then-existing customer base.  Windmere knew as early as March 1998 that, post-acquisition, it was obligated by local law in each country to create a new company for HPG in each Latin American country in which HPG operated and was required to register those entities with the authorities in each such country -- a complicated and time-consuming process that was not yet begun.  At the time of the July Offering and during the Class Period, the Company's failure to obtain such licenses in a prompt and timely manner was causing Windmere to experience declining international sales and undermining the business objectives that the HPG acquisition was intended to serve;

- prior to the sale of HPG to Windmere, Black & Decker caused HPG to aggressively stuff its distribution channels through extensive discounting and relaxation of payment terms, which allowed Black & Decker to sell HPG at an unrealistically high price.  Latin American retailers of HPG products were, therefore, already overstocked and the market flooded with HPG products even before Windmere's June 26, 1998 acquisition of HPG and certainly well before the July Offering.  Defendants knew of or recklessly disregarded, at least prior to the July Offering, that additional sales of HPG products to Latin American retailers would be

4

severely constrained in the latter part of 1998 until the bloated inventories of these retailers had been substantially worked off;

• the Company would be unable to obtain cost savings in the manufacture of HPG products for a substantial period of time and that it was unrealistic for the Company to represent that "immediate growth opportunities" would result from the combination of Windmere's and HPG's "manufacturing infrastructure."  In truth, HPG's manufacturing facilities in North Carolina, Mexico and Asia produced for all divisions of Black & Decker, not only HPG.  Severing HPG from Black & Decker's manufacturing operations after the acquisition would be extremely confusing, costly and time-consuming;

• in sum, Windmere purchased a company whose products it could not legally sell in Latin America, whose distribution channels had been stuffed prior to the sale and that was unable to provide the Company with any manufacturing efficiencies; and

• Windmere's 50% owned NewTech was then experiencing substantial problems meeting the orders of some of its largest department store customers, such as Wal-Mart, Ames Department Stores, Bradlees, and Walgreens, and as a result, was then suffering a substantial decline in its sales.

6.     Notwithstanding the aforementioned undisclosed problems, even after the July Offering, defendants Windmere, Friedson and Schulman continued to assure the marketplace that the Company was ahead of its scheduled plans, that the assimilation of HPG was "going smoothly," and that the Company was confident about its 1998 outlook.

7.     On September 23, 1998 -- only eight weeks after the July Offering -- the truth regarding Windmere's existing operations and its HPG acquisition was partially revealed. Windmere issued a press release on that date stating that it was experiencing weak international sales, particularly in Latin America, and that the Company's 50% owned joint venture, NewTech, was experiencing lower than expected earnings. Windmere's stock price collapsed, dropping below $7 per share -- an almost 80% decline from the July Offering price of $34.

8.     Defendants Friedson and Schulman, however, had protected themselves from this negative stock price decline. Prior to the stock price drop, Friedson and Schulman (and Desmond Lai, a member of Windmere's board), through a common broker at CIBC Oppenheimer in Boston, had developed and employed a hedging strategy to protect them from a decline in Windmere's stock price. Belying their positive statements to the marketplace, Friedson and Schulman employed a sophisticated trading strategy of using puts and calls on Windmere common stock that guaranteed that the value of their shares would be fixed in a range between no less than $21 per share and $33 per share. After the July Offering was completed, defendant Schulman, the Company's Chief Operating Officer stated, "I don't care if the stock drops -- we're all going to get rich."

9.     Windmere's stock price continued to decline after the September 23, 1998 revelation as the Company continued to report disappointing financial results and the problems with HPG continued to affect its operations adversely. Between September 23, 1998 and February 23, 1999, Windmere's common stock price declined from $7 to approximately $4 -- an additional 42% decline.

10.     Far from the $1.50 EPS Windmere touted for 1998, the Company's 1998 EPS was only $0.57 per share, excluding an extraordinary gain and charge.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933, as amended (the "Securities Act" or the "1933 Act") [15 U.S.C. §§ 77k, 77l(a)(2) and 77o] and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78t(a)], as amended, and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5]. Jurisdiction exists pursuant to § 22 of the Securities Act, [15 U.S.C. § 77v], § 27 of the Exchange Act, [15 U.S.C. § 78aa] and 28 U.S.C. § 1331.

12.     Venue is proper in this District pursuant to § 22 of the Securities Act and § 27 of the Exchange Act, as defendants conduct business in this District.

13.     In connection with the acts and transactions alleged herein, defendants used the instrumentalities of interstate commerce, including, *inter alia,* the U.S. mails and the facilities of the national securities markets.

## THE PARTIES

14.     Lead Plaintiffs Sherleigh Associates LLC and Sherleigh Associates Inc. Profit Sharing Plan ("Sherleigh") purchased shares of Windmere common stock in the July Offering and were damaged thereby. A copy of Sherleigh's certification is annexed to its original complaint in this action. The Windmere securities Sherleigh purchased were issued and sold in the July Offering and are traceable to the Registration Statement.

15.     The following individuals were named plaintiffs and filed initial complaints in this action: Ralph Casey, Gilbert Kunken, Jonathan Chariff Inc., David Light, Concetta

7

Bruno, Richard Ehrlich, Kam Chu Tam, Mon Tay Yan, Ming Heung Yan, and Oakwood Insurance Company. These named plaintiffs also purchased Windmere securities during the Class Period. Copies of plaintiffs' certifications setting forth their transactions in Windmere securities, are annexed to their initial complaints.

16.     The following individuals participated in the motion for lead plaintiff: Ron Asnin, Concetta Bruno, Ralph Casey, Steven Caspi, Bob Davis, Terry Davis, Richard Ehrlich, Guy DiCarlo III, Lane Dunlop, Stephen B. Gold, Martin Goldfarb, Nigel Keenan, Mitsuko Kumano, Gilbert Kunken, Kim Edward Miller, Dr. John W. Mortell, David Newman, Performance Exploration Company, Phyllis Preston, Andrea Schreiber, Stuart Schwartz, Jack Silver, Barbara Schulman, David Schulman, Sherleigh Associates LLC, Sherleigh Associates Inc. Profit Sharing Plan, Daniel Smetamick, Kam Chu Tam, Mon Tay Yan, Ming Heung Yan, Lynn B. Vandenberg, Robert J. Walters, Howard Waxman, Elizabeth Whitman, and Gregory Yu. Of this group of movants, the following were proposed as lead plaintiffs: Concetta Bruno, Richard Ehrlich, Steve Caspi, Martin Goldfarb, Gilbert Kunken, Performance Exploration Company, Sherleigh Associates LLC, Sherleigh Associates Inc. Profit Sharing Plan, Kam Chu Tam, Lynn B. Vandenberg, Mon Tay Yan and Ming Hueng Yan. (The Lead Plaintiffs, named plaintiffs, movants for lead plaintiff and previously proposed lead plaintiffs are referred to collectively as the "Parties Plaintiff".) Copies of the certifications of the Parties Plaintiffs setting forth their transactions in Windmere securities are annexed to the lead plaintiff motion.

17.     Of the Parties Plaintiff, the following are the plaintiffs and proposed class representatives as to Counts I, II and III alleged herein: Lead Plaintiffs Sherleigh Associates

LLC and Sherleigh Associates Inc. Profit Sharing Plan, David Newman, and Lynn B. Vandenberg.

18.    Of the Parties Plaintiff, the following are the plaintiffs and proposed class representatives as to Counts IV and V:  Martin Goldfarb, Performance Exploration Company, Phyllis Preston, Robert J. Walters, and Elizabeth Whitman.

19.    Defendant Windmere is incorporated under the laws of Florida and maintains its executive offices in Miami Lakes, Florida.  As of July 22, 1998, the Company had over 21.8 million shares of common stock outstanding.  During the Class Period, the Company's common stock was actively traded in an efficient market on the New York Stock Exchange.

20.    (a)    At all times relevant hereto, defendant David M. Friedson was CEO, President and Chairman of the Board of Directors of Windmere.  Because of Friedson's position with the Company, he had access to the adverse non-public information about its operations and products and present business prospects through internal corporate documents (including the Company's operating plan, budget and forecasts), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and from reports and other information provided to him in connection with the July Offering.  In addition, Friedson was a director of NewTech, a company that, during the Class Period was 50% owned by Windmere.  By virtue of this 50% equity ownership in NewTech, Windmere recognized 50% of the net earnings and losses of NewTech.  Friedson participated in the preparation of the July Offering, made presentations to investors in connection with the road show, and signed the Registration Statement.  Friedson had a duty to conduct a reasonable investigation in connection with the July Offering.

9

(b)     At all times relevant hereto, defendant Harry D. Schulman ("Schulman") was President and COO of Windmere Corp. and Chief Financial Officer of the Company. Because of his positions with the Company, he had access to adverse non-public information about Windmere's business, products and present and future business prospects through internal corporate documents (including the Company's operating plan, budget and forecasts), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and from reports and other information provided to him in connection with the July Offering. Schulman participated in the preparation of the July Offering, made road show presentations, and signed the Registration Statement. Schulman had a duty to conduct a reasonable investigation in connection with the July Offering.

21.     Montgomery was the lead underwriter for the July Offering, which it undertook on a firm commitment basis, a contractual arrangement under which Montgomery agreed to purchase all of the securities for sale in the July Offering for sale to the investing public. At all times, Montgomery was engaged in the business of investment banking, underwriting and selling securities to the investing public. As lead underwriter of the July Offering, Montgomery received substantial fees. Prior to the July Offering, Montgomery was required to, and did, conduct an investigation into the business, operations, prospects, financial condition and accounting and management control systems of Windmere, known as "due diligence investigation." In the course of such investigation, Montgomery would have obtained knowledge of the facts alleged herein if it had acted with reasonable care.

22.     During its due diligence, Montgomery conferred with Friedson and Schulman and other Windmere top executives, such as Cindy Solovei, the Company's Controller, and

Terry Polistina, Senior Vice President of Finance of Windmere as to: (i) how best to accomplish the July Offering; (ii) the mixture of debt and equity to be sold in the July Offering and the price at which these Windmere securities would be sold; (iii) the language to be used in the Registration Statement; (iv) the disclosures about Windmere and HPG to be made in the Registration Statement; and (v) the responses that would be given to the SEC when it reviewed the Registration Statement. Montgomery caused the Prospectus (and supplements) to be delivered to potential and actual purchasers of Windmere securities in connection with offers and sales thereof. As a result of its due diligence investigation, Montgomery knew or should have known that the Registration Statement contained untrue statements of material fact and omitted material facts needed to make the statements made not misleading.

**PLAINTIFFS' CLASS ALLEGATIONS**

23.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who acquired the publicly-traded securities of Windmere between May 12, 1998 and September 22, 1998 (the "Class"), including those who acquired Windmere stock or 10% Senior Subordinated Notes in Windmere's July 22, 1998 public offering (the "Offering SubClass"). Excluded from the Class are defendants and members of their immediate families, any entity in which a defendant has a controlling interest and the heirs of any such excluded party.

24.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at the present time, the Company has more than 21 million shares of common stock outstanding, owned by hundreds of shareholders throughout the country.

25.     Plaintiffs' claims are typical of the claims of the Class because plaintiffs and all the Class members sustained damages which arose out of defendants' unlawful conduct complained of herein.

26.     Plaintiffs are representative parties who will fully and adequately protect the interests of all Class members.  Plaintiffs are represented by counsel who are experienced and competent in both class action and securities litigation.  Plaintiffs have no interests which conflict with those of the Class they seek to represent.

27.     A class action would be superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

28.     The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, which could establish incompatible standards of conduct for defendants.  Questions of law and fact common to the Class predominate over any questions which may affect only individual members.  Among the common questions of law and fact are:

(a)     Whether the Registration Statement contained an untrue statement of material fact or omitted to state a material fact necessary to make the statements therein not misleading;

(b)     Whether the Securities Act or Exchange Act was violated by defendants' acts as alleged herein;

(c)     Whether defendants participated in or pursued the fraudulent scheme or course of business complained of;

(d)     Whether the Company's reports to the SEC on Forms 10-K and 10-Q, the Company's reports to shareholders, and its other publicly filed and/or disseminated documents or statements during the Class Period omitted and/or represented material facts about the Company;

(e)     Whether defendants acted knowingly, recklessly or wrongfully in omitting and/or misrepresenting these material facts;

(f)     Whether the market price of Windmere stock was artificially inflated by defendants' conduct complained of herein; and

(g)     Whether the members of the Class have sustained damages, and, if so, the proper measure of such damages.

29.     The names and addresses of the record owners of Windmere stock purchased, or otherwise acquired, during the Class Period are available from Windmere's transfer agent. Notice can be provided to such record owners *via* first class mail using techniques and a form of notice similar to those employed in class actions arising under the federal securities laws.

## SUBSTANTIVE ALLEGATIONS

**A.     Defendants' False and Misleading
Statements Prior to the July Offering**

30.     On May 11, 1998, Windmere issued a press release (filed with the SEC in a Form 8-K signed by defendant Schulman) announcing the acquisition of HPG. The release stated:

> Windmere-Durable Holdings, Inc., a diversified manufacturer and distributor of a broad range of consumer products, including personal care products for the home and professional salons, kitchen electric appliances and consumer electronics, today announced that it has signed a definitive agreement to

acquire The Black & Decker Corporation's Household Products Group, which
will include the Cooking, Garment Care, Food Preparation and Beverage
categories.

Pursuant to the terms of the acquisition agreement, Windmere will purchase
the assets of The Black & Decker Corporation's Household Products Group
for $315 million in cash.  In connection with the transaction, Windmere and
Black & Decker have established a long-term licensing arrangement which will
allow Windmere to continue to market products under the Black & Decker
brand name in the Cooking, Garment Care, Food Preparation and Beverage
categories in North and Latin and America, excluding Brazil, for a minimum
of six and one-half years on a royalty-free basis, with potential renewal
periods upon mutual agreement.

*  *  *

The combined company will be <u>uniquely positioned to capitalize on growth
opportunities</u> within the personal care and kitchen appliance categories.
<u>Immediate growth opportunities will result from the combination of innovative
product development, marketing capabilities and manufacturing infrastructure.</u>

31.    As reported by the *Sun Sentinel* on May 12, 1998:  "We've basically

leapfrogged into the major leagues," said Chief Financial Officer Harry D. Schulman.

32.    *The Miami Herald* reported on May 12, 1998:  "'We expect to cut their

[HPG's] costs and improve their margins significantly,' Friedson said.  'We are exactly

opposites,' Friedson said.  'We are Yin and Yang.  I don't believe there is a better fit.'"

Friedson also stated, as reported in this news article:  "'I said 2½ years ago that our long-

term strategy was to get out of [contract manufacturing] and private label and to eventually

marry a brand to our manufacturing capabilities,' Friedson said.  'The fact of the matter is,

I'm surprised that it happened as quickly as it did, and that I got the number one brand'."

33.    On May 12, 1998, at 8:30 A.M. Eastern time, the Individual Defendants

convened a nationwide conference call for large Windmere shareholders, hedge funds, stock

traders, brokers and securities analysts.  During the conference call and in subsequent one-on-one conversations, defendants stated:

- That the acquisition of HPG would provide Windmere with a well-known brand name and that this acquisition would more than triple the Company's 1998 revenues.

- That the HPG acquisition would be accretive and would allow Windmere to obtain substantial cost synergies as it would enable Windmere to obtain raw material and capacity utilization benefits;

- That one of the benefits obtained in the HPG acquisition would be combining Windmere's lower manufacturing costs with the Black & Decker brand name recognition;

- That Windmere was on schedule to post 1998 revenue of $750 million and EPS of $1.50.

34.     The representations made in ¶¶ 30 and 33 above, were materially false and misleading.  At the time defendants made these statements, Windmere did not have the licenses needed to conduct business in the Latin American countries in which it proposed to sell HPG products.  At least as early as March 1998 (as alleged more fully below), Windmere had contemplated acquiring HPG and was aware that it would need to organize separate companies in each Latin American country to lawfully sell HPG products. Defendants also ignored the fact that without such separate corporate entities and licenses, Windmere would be unable to call on HPG's existing customer base in Latin America. "Immediate growth opportunities" thus would not result from the acquisition of HPG.  On the contrary, given the time needed to obtain the necessary licenses in Latin America,

Windmere would have been unable to obtain them by the time of the July Offering.   At least through the end of the Class Period, Windmere did not have the necessary licenses to conduct business in Latin America.

35.     On May 15, 1998, Windmere filed its Form 10-Q for the first quarter of 1998, the period ending March 31, 1998.  In its 10-Q, Windmere reported sales of $55.3 million and net earnings of $1.136 million.  The 10-Q also reported the Company's decision to purchase HPG and thereby obtain the purported ability to market products in North and Latin America under the Black & Decker brand name for 6½ years on a royalty-free basis.  The Form 10-Q was signed by defendant Schulman, among others.  The Form 10-Q was silent on Windmere's lack of the required licenses to sell HPG products in any of the Latin American markets to which it sought access through the HPG acquisition.

36.     On June 10, 1998, Windmere issued a press release to announce management changes "that will successfully integrate the recent acquisition of Black & Decker Corporation's Household Products Group."  The June 10 press release again reported "Windmere-Durable's revenues for 1997 were $261.9 million, and with the pending acquisition of Black & Decker Corporation's Household Products Group, Windmere's annualized revenue rate will be approximately $750 million."

37.     On June 23, 1998, Windmere issued a press release relating to its acquisition of HPG.  It stated in pertinent part:

> "We look for the integration of The Black & Decker Household Products Group to begin as soon as the transaction is completed," added Mr. Friedson. "We expect to benefit from the significant business growth and operating synergies created by this acquisition beginning in the first six months of the acquisition and continuing through the next several years."

38.     The above quoted statements in ¶¶ 36-37 were materially false and misleading for the reasons set forth in ¶ 34 above and ¶ 46 below.

39.     Analyst reaction to the news of the HPG acquisition was favorable.  On May 13, 1998, CIBC Oppenheimer issued a "STRONG BUY" rating for the Company, issued after the May 12, 1998, conference call with the Individual Defendants.  CIBC Oppenheimer issued its favorable rating based in part on:  "sales synergies" such as expanding into new categories and selling Windmere-brand products in Latin America.

40.     The following day, McDonald & Co. issued an "aggressive buy" rating for Windmere, commenting on the apparently positive impact of the long-term licensing agreement allowing Windmere to use the Black & Decker name in North and Latin America and the potential cost savings in manufacturing.

41.     On or about June 26, 1999, Windmere completed its acquisition of HPG, purchasing the assets for approximately $315 million in cash.

**B.     The Road Show**

42.     During the road show between July 6 and July 21, 1998, defendants Montgomery, Schulman and Friedson participated in oral presentations, including demonstrative presentations with graphs and diagrams, stressing the success that Windmere was having and would continue to have integrating HPG's operations with its own and the revenue and cost synergies Windmere would derive therefrom.  Schulman and Friedson made road show presentations to investors and analysts in, among other cities, Boston and New York (at the Waldorf-Astoria).  Schulman and Friedson distributed financial information and graphs to those present at these presentations and disseminated sales figures.  Friedson and Schulman showed how moving production of Black & Decker's household products from its

17

existing plants (such as in Asheboro, North Carolina) to Windmere's plant in China would increase revenue-per-unit. Schulman and Montgomery gathered the information used to calculate the financial data on the Company used in road show presentations to investors, along with Windmere employees Cindy Solovei, the Company's Controller, and Terry Polistina, Vice President of Finance. Defendants' positive statements about Windmere's past and present revenues and earnings as well as Windmere's future prospects were consistent with the statements made in the Registration Statement.

43.     Defendants Windmere, Friedson and Schulman were under intense pressure to consummate the July Offering because the proceeds were needed to repay NationsBank for the bridge loan used to pay, in substantial part, for the HPG acquisition. Only by completing the July Offering could these defendants ensure the Company's repayment of the NationsBank loan and attain their stated goal of ascension to, as defendant Schulman reportedly put it, "the major leagues."

### C.     Materially False Statements and Omissions in the Registration Statement

44.     The Registration Statement, asserting the Company's ability to continue to post strong growth, stated:

> The Company has combined top brand names and a reputation for quality and innovation with its efficient, low-cost, vertically integrated manufacturing capabilities. The Company expects to continue to achieve growth and increased profitability by pursuing the following strategies:

> \* \* \*

> LEVERAGE MANUFACTURING CAPABILITIES

> \* \* \*

> EXPANSION OF THE COMPANY'S INTERNATIONAL PRESENCE

18

45.    With respect to the expansion of the Company's international presence, the

Registration Statement highlighted the Company's Latin American operations:

> The Company intends to utilize the marketing and distribution channels
> acquired through the HPG Acquisition to expand the global market penetration
> of all of its products, particularly in Latin America. As a result of the HPG
> Acquisition, the Company has acquired the leading market share in irons, and
> a smaller market presence in the blender category, in Argentina, Colombia,
> Ecuador, Puerto Rico, Venezuela, Chile, Mexico and the Caribbean. In
> addition to targeting mass merchandisers, wholesalers, warehouse clubs and
> government institutions in Latin America, the Company intends to pursue
> alternative channels of distribution in Latin America which it believes will
> continue to be important sources of sales. On a pro forma basis after giving
> effect to the HPG Acquisition, the Company's international sales would have
> been $218.9 million in 1997, as compared to $82.1 million in international
> sales for Windmere-Durable alone in 1997.

46.    The statements detailed in ¶¶ 44-45 above, were materially false and failed to

disclose material, adverse facts at the time the statements were issued.  The true facts were:

(a)    Specifically, on or prior to the effective date of the Prospectus, July 22,

1998, Windmere could not use Black & Decker's existing licenses to operate its business in

Latin America.  HPG Latin America was not previously run as a separate entity by Black &

Decker, but functioned as part of Black & Decker's Power Tools Division.  When Windmere

acquired HPG, it was required to undergo the complicated and time-consuming process of

creating a new company for HPG in each Latin American country in which HPG operated

and was required to register those entities to do business.  Thus, Windmere could not even

call on HPG's existing customers in Latin America for continued business because it lacked

the proper licenses to sell HPG's products in those foreign countries.  Windmere had

internally projected that these corporate entities would be organized between March and June

1998.  Nevertheless, the corporate requirements had not been met prior to the Class Period

or the July Offering.  Thus, at the time the Company issued the statement in ¶ 45 above, it

was unable to "utilize the marketing and distribution channels" of HPG to expand market penetration in Latin America until it had obtained the requisite licenses.  In July 1998, a former HPG employee visited the Company's manufacturing plant in Queretaro, Mexico, and learned that Windmere could still not call on HPG's existing customers and was losing business as a result.  Indeed, Windmere had not obtained the necessary licenses throughout the Class Period.  In late July and August, Windmere's General Counsel sought to move the licensing process forward, but without success.  As a result, throughout the Class Period, Windmere failed to meet the necessary corporate requirements and obtain the needed licenses to do business in Latin America.  The Company would not be able to realize significant profits in Latin America until the legal requirements of doing business there had been met. The Company's lack of the necessary licenses prior to Windmere's takeover of the HPG business in Latin America constituted a principal cause for the Company's later revealed poor performance during the Class Period.

(b)    Moreover, in a summer 1998 senior-staff meeting, significant problems with the integration of HPG's Latin American Division were discussed.  Soon after it acquired HPG on June 26, 1998, Windmere discovered that Latin American retailers' warehouses were overstocked with HPG products.  As a result, Windmere could not sell product in Latin America competitively because retailers were saturated resulting from prior sales of HPG products to them at discounted prices and on other favorable terms.  Windmere was fully aware of the excessive inventory build-up problem in Latin America at least as early as when the Company acquired HPG.  By the time Windmere acquired HPG on June 26, 1998 and for almost a full month thereafter before the July 22, 1998 effective date of the Registration Statement, the inventories of Latin American retailers were bloated with HPG

products and additional sales of HPG products to them at least throughout the remainder of 1998 would very difficult to achieve until those inventories had been substantially sold off. Defendants Windmere, Schulman and Friedson had begun operating HPG by June 26, 1998, when HPG was acquired. Indeed, defendants themselves told the marketplace and investors during road show presentations that Windmere was already in the process of integrating the operations of HPG. There was thus a large build-up of HPG products on the shelves of HPG's Latin American retailers before the July Offering and sale of securities to plaintiffs and class members. Despite the severity of the sales problem for Windmere, the Company failed to disclose it to the investing public in the Registration Statement and instead emphasized the dramatic increase in sales which would purportedly result from the HPG acquisition.

47.     In addition, Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), requires the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

The Instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results.

48.     In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining

when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the Registrant's results of operations.

49.   In the section of the Registration Statement entitled "Management's Discussion And Analysis Of Financial Condition And Results Of Operations," defendants were required to "discuss any material changes in the registrant's result of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided and the corresponding year-to-date period of the preceding fiscal year." Defendants made the following statement concerning the material change in HPG's revenues:

> Net sales decreased by $3.6 million or 5.5%, to $61.8 million for three months ended March 31, 1998 from $65.4 for the three months ended March 30, 1997. <u>Strategic price decreases with respect to certain sourced food preparation and cooking products as well as price concessions given to a significant customer in Mexico accounted for the decrease. In addition, HPG's KT Kitchentool (TM) line was late in launching new products due to production delays at a third party source. HPG expects these items to similarly impact net sales for the second quarter of 1998.</u> [Emphasis added.]

50.   Item 303 of Regulation S-K required defendants to disclose in the Registration Statement that the Company did not have the requisite licenses to sell HPG's products in Latin America. In addition, Item 303 also required the Company to disclose in the Registration Statement that Black & Decker overloaded its distribution channels during the first and second quarters of fiscal 1998 with product which caused the market for the newly acquired HPG to become saturated. Indeed, this factor is evidenced by the Company's partial disclosure above about its willingness to grant material price concessions to, at least, one significant customer.

22

51.     The above noted factors were reasonably likely to have a material adverse effect on Windmere's operating results during, at least, the second half of fiscal 1998. Nonetheless, the Registration Statement failed to disclose such information, which was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.

52.     Moreover, Windmere's purported risk statement entitled "Risks of International Operations and Expansion" was itself false and misleading in stating there was no assurance that any of the facts "<u>will</u>" in the future not have a material adverse effect on the Company's business or financial condition.  In fact, those events had already occurred and were <u>already</u> affecting Windmere's business by the date of the Registration Statement.

53.     The Registration Statement stated:

### RISKS OF INTERNATIONAL OPERATIONS AND EXPANSION

A substantial amount of the Company's manufacturing operations are conducted and located abroad, and the Company's growth strategy involves expanding its operations in foreign jurisdictions.  The Company also sells its products and conducts business in several foreign countries.  The Company is affected by economic and political conditions in those countries, including fluctuations in the value of currency, duties, possible employee turnover, labor unrest, lack of developed infrastructure, longer payment cycles, greater difficulty in collecting accounts receivable, <u>the burdens and costs of compliance with a variety of foreign laws</u> and, in certain parts of the world, political instability. ...  There can be no assurance that any of these factors will not have a material adverse effect on the Company's business, financial condition and results of operations.

The statement was materially false, misleading and incomplete because, as set forth herein, Windmere's actual historical experience regarding "compliance with a variety of foreign laws" was already materially reducing sales in Latin America because the Company could not do business with HPG's existing customers.  In considering the HPG acquisition, the

Company had internally projected that it would obtain the required licenses between March and June 1998, a period well before the issuance of the above statements. In addition, as discussed in a June 1998 senior staff meeting, Latin American retailers were inundated with HPG products, making sales unlikely even if Windmere were authorized to do business in the region.

54.     Thus, this supposed "risk statement" in the Registration Statement was nothing but a generic warning containing no meaningful factual disclosure of the adverse facts which were then actually negatively impacting Windmere's business by at least July 22, 1998 as set forth above.

55.     In a paragraph in the Prospectus entitled "High Volume, Low-Cost Manufacturing Capabilities," the Company stated:

> The Company's products are manufactured primarily at the Company's facilities in the PRC and the United States, and The Black & Decker Corporation's manufacturing facilities in Mexico, which it has contracted to acquire upon the receipt of certain Mexican governmental approval. Prior to the HPG Acquisition, 85-90% of Windmere-Durable's products were manufactured at Durable's plant in the PRC. Durable is a vertically integrated manufacturing operation, with the capacity and expertise to handle all phases of product manufacturing, from design to component manufacturing to final assembly. Durable manufactured over 24 million finished goods units and millions of additional components in 1997. The Company believes that its high volume, vertically integrated manufacturing capabilities provide the Company flexibility and cost advantages.

56.     The Company also emphasized its manufacturing "strengths" stating:

> The Company intends to take advantage of its capabilities as a multinational manufacturer to reduce operating costs and increase productivity.

57.     The Company's statements in ¶¶ 55-56 above, regarding its manufacturing capabilities and ability to reduce operating costs as a result of the HPG acquisition were materially false and omitted material information. At the time the above statements in the

24

Registration Statement were made, HPG's manufacturing facilities in North Carolina, Mexico and Asia produced for all divisions of Black & Decker, not only HPG. Thus, it would be extremely confusing, costly, and time-consuming to sever HPG from Black & Decker's manufacturing operations after the acquisition. Indeed, making transitions to source production for HPG would take a significant amount of time, and Windmere would have to find its own companies to create HPG products. Windmere nevertheless told the public in its June 23, 1998 release (¶ 37 above), that it expected to enjoy the benefits and synergies from the HPG acquisition "beginning in the first six months of the acquisition." Given the significant manufacturing hurdles that had to be overcome once HPG was extricated from Black & Decker, six months was over-optimistic. Windmere did not even begin to close its Asheboro, North Carolina plant and switch production to China and Mexico until approximately late February 1999.

58.    Against these specific and substantial problems with the HPG acquisition, defendants merely set forth a generalized warning about the integration of HPG. These warnings did nothing to offset or neutralize the adverse risks existing at the time of the July Offering, namely that the Company had no licenses to operate the HPG business in Latin America and could not call on existing HPG customers; that the channels of distribution in Latin America had already been stuffed and that sales would suffer significantly until those retail inventories of HPG products were worked off; and that it would be very difficult to sever HPG from Black & Decker's manufacturing operations.

59.    With respect to NewTech, the Registration Statement stated:

The Company has an approximately 50% interest in NewTech. NewTech, ... designs, sources, manufactures, and markets high-quality, value priced brand-name consumer electronic products. ... By having a portfolio of brand names,

NewTech is able to offer retailers proprietary and flexible merchandising
programs. NewTech currently sells its products to 15 retailers which operate
over 14,000 retail outlets in the United States and Canada, including mass
merchandisers such as K-Mart and Wal-Mart and other retailers, including
Rite-Aid Corporation, Zellers Inc. and Ames Department Stores, Inc.

60.     The Registration Statement also stated that:

The Company is dependent on certain of its principal customers. ... and the
top ten customers of the Company would have accounted for approximately
44% of the Company's 1997 net sales. ... A decrease in business from any of
its major customers could have a material adverse effect on the Company's
business, financial condition and results of operations.

61.     The above statements, including the purported risk statement regarding

decreases in top customer business, were false and misleading. During the Class Period,

NewTech was unable to deliver product to several of its top customers and suffered declining

sales as a result. For example, Ames Department Stores ("Ames"), a NewTech customer,

dropped NewTech as a supplier because it could not get product that was ordered or products

arrived late. (Ames previously did business with Craig Electronics, but when that company

became insolvent, Joel Newman, the head of NewTech, picked up Ames as a customer and

obtained its business.) Ames had placed firm orders for product in the second, third and

fourth quarters of 1998, but was unable to obtain product from NewTech or received only

partial delivery. Ames found that NewTech was poorly organized and had little

infrastructure in place to facilitate communication between NewTech and its customers. In

addition, other NewTech customers, such as Bradlees and Walgreens, suffered because

NewTech could not deliver goods which these stores were offering to the public as advertised

specials.

62.     NewTech frequently gave preference to other customers, such as K-Mart, at

the expense of NewTech's other large department and retail store customers. Nevertheless,

even K-Mart suffered late shipments from NewTech on advertised goods. (NewTech sold the White-Westinghouse line of products to K-Mart.) NewTech frequently told K-Mart that product was *en route* to K-Mart Stores, when, in fact, no product was shipped. K-Mart, like NewTech's other large customers, would advertise specials for which NewTech was responsible to deliver the stock. (Joel Newman and Pat Law were responsible for the K-Mart account; Newman reported directly to defendant Friedson.) NewTech frequently failed to deliver product to K-Mart to meet the demand of K-Mart's advertised specials. Although NewTech was able to obtain K-Mart business initially because of low price offerings in 1997, over time and during the Class Period, NewTech's K-Mart and other department and retail store business declined substantially due to NewTech's inability to timely and adequately supply product to these stores.

63.     Because of these factors, there was no reasonable basis in fact for the representations made by defendants in connection with the July Offering that Windmere would have EPS of $1.50 in 1998. Indeed, as disclosed in the Company's Annual Report to Shareholders for 1998, excluding an extraordinary gain and an extraordinary charge, 1998's net income was $12.3 million, or only $0.57 per share.

### D.     Defendants' Post-Offering Conduct During the Class Period

64.     Immediately following the July Offering, the price of Windmere stock began to drop as rumors of problems at HPG began to leak out. This caused defendants grave concern because they knew that a rapid decline in Windmere's stock price, immediately after a $233 million offering, would infuriate investors and subject defendants' false statements and omissions to intense scrutiny.

65.    On August 11, 1998, Windmere issued a release reporting "Record Revenues for 1998 Second Quarter and First Half." The release stated:

Windmere-Durable Holdings, Inc., today announced financial results for the second quarter and first six months of 1998.

For the second quarter ended June 30, 1998, net sales increased 4.2 percent to a record $62.6 million from $60.1 million for the year-ago quarter. LitterMaid contributed to the sales growth, as units sales increased more than threefold. For the quarter, the net loss of $7.9 million, or $0.38 per share, was due to a repositioning charge totaling $11.4 million, or $0.55 per share, after tax. The previously announced charge consists of write-offs associated with the Company's decision to discontinue certain non-core, low-margin, low-value product lines and costs to integrate the Company's acquisition of The Black & Decker Household Products Group.

*    *    *

"We are pleased with the improved revenues and profitability achieved during the second quarter and first half of the year," said David M. Friedson, Windmere-Durable's Chairman, President and Chief Executive Officer. "LitterMaid continues to increase its penetration into the retail market, and the overall profitability of Durable has been enhanced by the financial instability experienced in the Asian markets, which has resulted in decreased raw material costs."

Commenting on the integration of the acquisition of The Black & Decker Household Products Group, Mr. Friedson stated, "We are ahead of our scheduled plans, the assimilation of the acquisition is going very smoothly and we are confident in our ability to integrate our new business. By doing so, we have reallocated our resources to higher-margin, higher-volume products. We are very optimistic about the rest of 1998 as well as the Company's long-term growth outlook.

"Since the end of the quarter, Windmere-Durable has completed several transactions that have greatly strengthened our financial position," concluded Mr. Friedson. "We successfully completed a secondary offering of approximately three million shares of common stock at a price of $34 per share and an offering of $130 million in senior subordinated notes. These transactions, combined with the $50 million in net after tax cash proceeds the sale of our Salton/Maxim equity, have substantially reduced our debt to total capitalization from approximately 61.0 percent to approximately 39 percent on a pro-forma as adjusted basis."

66.     On or about August 12, 1998, defendants Friedson and Schulman organized a nationwide conference call for large Windmere investors, hedge funds, stock traders, brokers and securities analysts.  During the conference call and in subsequent one-on-one conversations, defendants stated:

- That gross margins were strengthening;

- That the integration of the HPG was progressing well, placing Windmere on track to post 1998 EPS of $1.50;

- That the Company had taken a one-time $11.4 million charge in connection with the acquisition of the HPG and Windmere's decision to drop certain product lines and that this would result in a $0.08-$0.10 savings per share;

- That Windmere was beginning to leverage the Black & Decker brand name.

67.     On August 14, 1998, Windmere filed its second-quarter Form 10-Q with the SEC for the period ended June 30, 1998.  Windmere reported quarterly sales of $62,568,000.  The Company reported its June 26, 1998 acquisition of HPG and the successful completion of the July Offering.  The Form 10-Q stated that pursuant to the HPG acquisition, Windmere obtained the ability to sell HPG products in North, Central and South America (except Brazil) under the Black & Decker name for 6 1/2 years on a royalty-free basis.  The Form 10-Q, however, was silent on (a) Windmere's continued lack of the required licenses to sell HPG products in any of the Latin American countries to which the HPG acquisition was designed to afford Windmere access; the bloated inventory condition of HPG's Latin American retailers and the adverse consequences for Windmere due to that condition; and (c) the then decreasing sales at NewTech due to that joint-venture's inability to satisfy department and retail store customers with sufficient product and on-time

deliveries.  The Company's Form 10-Q for the second quarter of 1998 was signed by, among others, defendant Schulman.

68.    The statements referenced above in ¶¶ 65-66 made by defendants were each false and misleading when made for failing to disclose and/or misrepresenting the true facts which were then known to defendants based upon internal Windmere data.  The true facts were:

(a)    That the acquisition of HPG was not "going very smoothly" as the Company was experiencing significant difficulties integrating HPG's operations with its own;

(b)    That retailers in Latin America were overstocked with HPG products and additional sales were unlikely until the overstocking was reduced;

(c)    That because the Company had failed to obtain the necessary licenses to do business in Latin America, the Company could not call on HPG's existing customer base, which would significantly reduce international sales;

(d)    That HPG was generating revenue almost 30% below the estimates disseminated by defendants during the Class Period;

(e)    That NewTech was unable to deliver sufficient product to its department and retail store customers;

(f)    That because of (a)-(e) above, defendants knew there was no reasonable basis in fact for the representations made by defendants that Windmere would post 1998 EPS of $1.50.

## THE TRUE FACTS BEGIN TO EMERGE

69.     On September 23, 1998, Windmere shocked the market by announcing that the

Company anticipated that its financial results for the quarter ending September 30, 1998, and

full year ending December 31, 1998, would fall far short of analysts' expectations.  The

release stated:

> Household Products, Inc., formerly Black & Decker Household Products
> Group that was acquired on June 26, 1998, is experiencing weak international
> sales, primarily in Latin America and Canada, and softness in the domestic
> market for higher-end product lines.  As a result, Household Products' third-
> quarter sales of Black & Decker-branded products will be as much as $30
> million to $40 million off from their original planned budget.  Higher-than-
> planned expenses to integrate and delink Household Products, Inc., from Black
> & Decker on the reduced sales volume will further contribute to lower profit
> margins.

> Additionally, Newtech Electronics Industries, Windmere-Durable's 50 percent
> owned joint venture is experiencing lower-than-expected earnings.

In addition, the release revealed that Michael P. Hoopis, president of HPG, and a long-time

Black & Decker employee, had resigned to become CEO of another U.S. corporation.

70.     In response to this announcement, the price of Windmere stock plummeted,

falling $8.50 per share to close at $7.1875 per share -- a decline of nearly 80% from the July

Offering price of $34 per share.

71.     Analysts were highly surprised by the Company's announcement.  For

example, analyst Kyle Kavanaugh of Schroeder & Co. was quoted in news reports as

follows:

> "They caught everybody by surprise, . . . I think the business can still get
> worse.  These problems can continue for several quarters."

72.     Indeed, the Company's September 23, 1998 press release failed to reveal the

full truth.  The Company failed to disclose any of the problems regarding its failure to obtain

31

licenses to sell product in Latin America and the fact that the Company still had not obtained these licenses, any information regarding the bloated inventory levels of its Latin American retailers, or any facts relating to why NewTech's earnings were decreasing.

73.     After the end of the Class Period and the September 1998 partial revelation, Windmere has continued to suffer problems and its stock price has suffered further erosion. As previously stated, the President of HPG, Michael P. Hoopis, resigned the Company.  On February 24, 1999, the Company revealed further problems as a result of losses at its 50% owned NewTech Electronics Industries, Inc.  As a result, Windmere's stock plunged even further from $7 to approximately $4 per share.

### COUNT I

#### [Against All Defendants For Violations Of
#### Section 11 Of The Securities Act]

74.     Lead Plaintiffs Sherleigh Associates LLC and Sherleigh Associates Inc. Profit Sharing Plan, and plaintiffs Lynn Vanderburg and David Newman repeat and reallege ¶¶ 11-27, 28(a)-(b), (g), 29; 44-63; and 70 as if set forth herein.

75.     This Count is brought by these plaintiffs pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Offering SubClass, against all defendants.  The claim asserted in Count I is not based on any allegation of fraud set forth above and no such allegation is incorporated herein.

76.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and failed to adequately to disclose material facts as described above.

77.     The Company is the registrant for the July Offering.  Montgomery was an underwriter of the Windmere securities sold in the July Offering as defined in § 11(a)(5) of the Securities Act.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement and caused its filing with the SEC.

78.     Windmere is the issuer of the securities sold *via* the Registration Statement. As issuer of the securities (common stock and notes), Windmere is strictly liable to plaintiffs and the Class for the misstatements and omissions.

79.     As underwriter of the July Offering, Montgomery was obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time it became effective, to ensure that said statements were not misleading and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Montgomery did not make a reasonable and diligent investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement at the time it became effective were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  As such, Montgomery is liable to plaintiffs and members of the Offering SubClass.

80.     None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, did not omit any material fact and/or were not misleading.

81.     Each of the defendants issued, caused to be issued and participated in the issuance of the materially false and misleading written statements to the investing public

33

which were contained in the Registration Statement, or set forth above.  As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the offering price of Windmere securities was artificially inflated in the July Offering, and plaintiffs and members of the Offering SubClass suffered substantial damage in connection with their purchase of Windmere securities.  By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, § 11 of the Securities Act.

82.    At the times they purchased Windmere securities from defendants, plaintiffs and other members of the Class were without knowledge of the facts concerning the false or misleading statements or omissions alleged herein.  Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts upon which this action is based to the time that plaintiffs filed the actions consolidated herein.  Less than three years have elapsed from the time that the securities upon which this Count is brought were *bona fide* offered to the public to the time plaintiffs filed the actions consolidated herein.

## COUNT II

### [Against All Defendants For Violations Of
### Section 12(a)(2) Of The Securities Act]

83.    Lead Plaintiffs Sherleigh Associates LLC and Sherleigh Associates Inc. Profit Sharing Plan, and plaintiffs Lynn Vanderburg and David Newman repeat and reallege ¶¶ 11-27, 28(a)-(b), (g), 29; 30-63; and 70 as if set forth herein.

84.    This Count is brought by these plaintiffs pursuant to § 12(a)(2) of the Securities Act on behalf of the Offering Subclass.  The claim asserted in Count II is not

based on any allegation of fraud set forth above and no such allegation is incorporated herein.

85.     The defendants named in this Count were sellers, offerors, and/or solicitors of sales of the shares in the July 22, 1998 Registration Statement.

86.     The actions of solicitation taken by the defendants named in this Count included participation in the preparation and dissemination of the false and misleading Registration Statement and the road show presentations.  The Registration Statement contained untrue statements of material fact, omitted other facts needed to make the statements made not misleading, and failed to disclose material facts.  In addition, the written and oral communications made in connection with the road show presentations contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and failed to disclose material facts.

87.     Montgomery offered for sale and sold the shares purchased by plaintiffs and the members of the Offering SubClass and received substantial fees and other compensation in connection with the Offering.  Because NationsBank (Montgomery's parent) had extended over $100 million in debt *via* bridge financing to Windmere to complete the HPG purchase, and Montgomery had invested substantial time and effort in the July Offering and Montgomery was committed to purchase all of the Company's shares, Montgomery bore a substantial risk of loss if the July Offering was not consummated.  Montgomery had a clear financial interest in consummating the July Offering.

88.     Each defendant named in this Count solicited and/or was a substantial factor in the purchase by each member of the Offering SubClass of Windmere securities.  But for the participation by these defendants, including the solicitation as set forth herein, the July

Offering could not and would not have been accomplished. These defendants were motivated, at least in part, by a desire to serve their own financial interests. Said defendants did the following acts in furtherance of the sale of Windmere securities:

(a)     They actively and jointly drafted, revised, and approved the Registration Statement and other written selling materials by which the Offering was made to the investing public. These written materials were "selling documents," calculated by these defendants to create interest in Windmere securities and were widely distributed by defendants for that purpose;

(b)     These defendants finalized the Registration Statement and caused it to become effective. But for these defendants having drafted, filed, and/or signed the Registration Statement, the July Offering of Windmere securities could not have been made; and

(c)     These defendants conceived and planned the July Offering and together jointly orchestrated all activities necessary to effect the sale of these securities to the investing public, including the Offering Subclass, by issuing the securities, promoting the securities, supervising their distribution and ultimate sale to the investing public.

89.     The defendants were obligated to make a reasonable and diligent investigation of the written and oral statements made in the Registration Statement and road show presentations, to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the July Offering materials as set forth above.

90.     Plaintiffs and other members of the Offering SubClass purchased or otherwise acquired Windmere shares pursuant to the defective Registration Statement.  Plaintiffs did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement or made in connection with the road show presentations.

91.     Plaintiffs assert the right of all members of the Offering SubClass to tender to defendants those securities which plaintiffs and other members of the Offering Subclass continue to own, on behalf of all members of the Offering Subclass who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

92.     By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, § 12(a)(2) of the Securities Act.  As a direct and proximate result of these violations of § 12(a)(2), plaintiffs and other members of the Offering Subclass sustained substantial damage in connection with the purchase of Windmere stock.  On behalf of themselves and all other members of the Offering Subclass who still hold their Windmere shares, plaintiffs seek rescissory damages.  Accordingly, plaintiffs, on behalf of all members of the Offering Subclass who continue to own such securities, seek to obtain a right to rescind and recover the consideration paid for their Windmere securities and to permit Offering SubClass members to rescind and tender their Windmere securities to the defendants sued herein.

93.     Less than three years has elapsed from the time that the securities upon which this Count is brought were sold to the public to the time of the filing of the actions consolidated herein.  Less than one year has  elapsed from the time when plaintiffs

discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of the actions consolidated herein.

## COUNT III

### [Against The Individual Defendants
### For Violations of Section 15 of the Securities Act]

94.     Plaintiffs Sherleigh Associates LLC and Sherleigh Associates Inc. Profit Sharing Plan, and plaintiffs Lynn Vanderburg and David Newman repeat and reallege ¶¶ 11-63; 70; and 74-93 as if set forth herein.

95.     This Count is brought by these plaintiffs pursuant to § 15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants.  The claim asserted in Count III is not based on any allegation of fraud set forth above and no such allegation is incorporated herein.

96.     Defendants Schulman and Friedson, by reason of their stock ownership, management position, and/or membership on the Company's Board of Directors, were controlling persons of the Company and had the power and influence, and exercised the same, to cause Windmere to engage in the violations of law complained of herein.  The Individual Defendants are liable under § 15 of the Securities Act.

## COUNT IV

### Against All Defendants For Violation Of
### Section 10(b) Of The Exchange Act And Rule 10b-5

97.     Plaintiffs Martin Goldfarb, Performance Exploration Company, Phyllis Preston, Robert J. Walters, and Elizabeth Whitman repeat and reallege ¶¶ 1-73 set forth above, as though fully set forth herein.  This Count is asserted against all defendants.

98.     This Count is brought by these plaintiffs pursuant to § 10(b) of the

Securities Exchange Act on behalf of all Class Members.

99.     Defendants Windmere, Friedson and Schulman knew, or were reckless in not knowing, of the material omissions from and misrepresentations contained in the statements as set forth above.  With respect to defendant Montgomery, it knew of or recklessly disregarded the false statements and omissions contained in the Registration Statement.  Each of these defendants:  (a) knew or had access to the material adverse non-public information about HPG's adverse financial outlook and then existing business conditions, which was not disclosed; and (b) directly or indirectly participated in drafting, reviewing and/or approving the misleading statements, releases, analyst reports and SEC filings, including Registration Statement and other public representations of and about Windmere.

100.    Throughout the Class Period, defendants with knowledge of or reckless disregard for the truth, disseminated or approved releases, statements and reports, referred to above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101.    Each of the defendants had actual knowledge of the falsity of their statements, and had the motive and opportunity to perpetrate the fraudulent scheme alleged herein.

102.    During the Class Period, defendants knew or recklessly disregarded the problems occurring with HPG sales and manufacturing before the July Offering.  As alleged above, Windmere acquired HPG on June 26, 1998 and as the new owner, took over HPG's operations.  Defendants Windmere, Friedson and Schulman knew as early as March 1998 that the Company would be unable to run HPG without the necessary licenses in place, and that these licenses would take a substantial period of time to obtain.  Moreover, upon the

acquisition of HPG on June 26, 1998 and thereafter through Windmere's operation of the
business, defendants learned that HPG had already flooded the Latin American market with
household products -- a circumstance that prevented Windmere from continuing to sell
product until these bloated retail inventories were worked down.

103.    In addition, defendants acted with scienter throughout the Class Period in that
they either knew of or recklessly disregarded the Company's inability to produce
manufacturing efficiencies through the acquisition of HPG. As defendants well knew or
recklessly disregarded, significant manufacturing hurdles had to be overcome to extricate
HPG from Black & Decker.

104.    Defendants also acted with scienter during the Class Period because they knew
or recklessly disregarded that NewTech was then experiencing substantial problems keeping
its department and retail store customer base and was then experiencing a substantial and
material decline in sales as a result of its inability to satisfy customer demand for product
together with on-time delivery. As a result, NewTech's sales were substantially declining as
defendants then knew, and because Windmere shared in NewTech's losses by virtue of its
50% ownership, the Company was then experiencing a substantial slowdown in sales which
should have been disclosed.

105.    Scienter is further demonstrated by the Individual Defendants' motive and
opportunity to commit the fraud. Windmere's executive compensation plan provided its
officers a motive to artificially inflate Windmere's financial results, and to falsify its progress
with respect to the HPG acquisition. (Opportunity is demonstrated by defendants' control of
their public statements and their knowledge of the true state of Windmere's business). As
disclosed in the Company's Form 14A filed on April 20, 1998, Windmere's compensation

program provided for its officers to be compensated in significant part by annual bonuses dependent on increases in the Company's net income and performance for that year. In August 1998, only a month prior to the Company's disclosure of its true financial situation, defendant Friedson received a cash bonus of $5,000,000 in addition to his annual salary of $1,014,710 as well as 1,035,000 stock options. As reported in a June 14, 1999 article in *The Miami Herald*, Friedson's compensation totalled $15.9 million -- despite the fact that Windmere stock fell more than 65% in the same year. Defendant Schulman received a 1998 cash bonus of $500,000 and 1,500 options. Thus, the Individual Defendants had the motive to conceal the serious problems with the HPG acquisition and ensure that Windmere common stock continued to trade at artificially high levels so that their 1998 cash bonuses, which were disbursed prior to the Company's largest-ever decline in stock price, would be larger. Defendants stood to collect $5,500,000 in total cash bonuses, which in defendant Friedson's case, represented nearly five times his annual cash compensation.

106. Moreover the Individual Defendants' scienter is demonstrated by the fact that their highly positive statements to the marketplace were belied by the hedging of their own Windmere stock positions against a decline in the Company's stock price. Notwithstanding their highly positive statements -- such as that the Company would triple its revenues in 1998 -- defendant Schulman gave up the right to stock appreciation above $33 per share and defendant Friedson gave up the right to stock appreciation above $31 per share. Prior to the July Offering, the Individual Defendants employed exotic trading strategies to lock in profits at bargain prices. Through a sophisticated strategy of "hedging" their positions through the use of "collars," "puts" and "calls," defendants insulated themselves from the adverse effects of their own fraud.

107.   "Hedging" refers to a strategy designed to reduce investment risk and lock in profits through puts and calls.  A "put" is an option granting the right to sell the underlying futures contract (an agreement to buy or sell a set number of shares of a specific stock in a designated future month at a price agreed upon by the buyer and seller).  A "call" is an option that gives the right to buy the underlying futures contract.

108.   Both defendants, Schulman and Friedson, employed hedging techniques known as "zero-cost collar" positions to lock in the value of their stock and thus limit market exposure.  A detailed example of defendants' "zero-cost collars" based on defendants' SEC Form 4 filings is annexed hereto as Exhibit A and is fully incorporated herein.

109.   A "zero-cost" collar position is composed of:  (1) underlying common stock; (2) the sale of an out-of-the-money call option; and (3) the simultaneous purchase of an out-of-the-money put option with the proceeds from the call sale.  The resulting market exposure of this position is locked between the two strike price levels of the call and put.

110.   A call option is "out-of-the-money" if the strike price (the stated price per share for which underlying stock may be purchased or sold) is greater than the market price of the underlying security.  A put option is "out-of-the-money" if the strike price is less than the market price of the underlying security.

111.   A "zero-cost collar" is set up by the bank or brokerage so that the cost of buying the put options is exactly offset by the proceeds from the sale of the call options -- for "zero-cost".  The minimum value for defendants Schulman and Friedson's transactions is 90% of current market price.

112.   On December 2, 1997, defendant Schulman locked in the value of 98.5% or 100,000 of his 101,481 then-owned Windmere common shares at a value between $20.9585

42

and $33.3008 for a term of four years.  Thus, defendant Schulman had exposure to only 10% of any decline in the price of Windmere common stock from its then-current level of $23 per share.  In return, Schulman retained 44.8% upside appreciation potential from $23 per share.  Schulman paid approximately $5.75 per share for his Windmere common stock, which was apparently purchased exclusively through Company-granted options at below market prices.  Thus, even if Windmere common stock were to fall below $5.75 per share, defendant Schulman was guaranteed to make a minimum profit of approximately $15.20 per share ($20.95 - $5.75) or $1,520,000 on his 100,000 hedged shares.

113.    On December 9, 1997, defendant Friedson locked in the value of 94.8%, or 400,000 of his 421,949 then-owned Windmere common shares at a value between $20.0561 and $31.867 for a term of four years.  On March 2, 1997, Friedson locked in the value of an additional 200,000 of Windmere common shares at a value between $24.40 and $34.573 for a term of four years.  Both of these transactions limited Friedson's exposure to only 10% of any decline in the price of Windmere stock from its then-current levels.

114.    Defendants Schulman and Friedson executed these hedges through the same broker at CIBC Oppenheimer in Boston, Massachusetts.  Desmond Lai, a director of the Company, also executed the same Windmere hedging strategy through this Boston broker.

115.    As a result of the Individual Defendants' hedging strategy they enjoyed the following advantages:

(a)    Since defendants had already amassed large profits on their holdings due to the low cost bases of their underlying securities, the elimination of any market exposure below 90% of the current stock price would guarantee them substantial profits on their current holdings even if Windmere common stock declined precipitously;

43

(b)      if defendants took out a loan using Windmere common stock as collateral, they would not be subject to a forced collateral sale at "fire sale" prices if Windmere's price declined;

(c)      capital gains taxes payable on the sale of the underlying Windmere common stock could be deferred for at least four years while locking in the minimum gain.

116.    As a result of this well-planned trading strategy, the Individual Defendants were unaffected by the drop in price of Windmere common stock, which occurred in September 1998, as alleged below.  Thus, they had little concern about the truth or falsity of their statements concerning, among other things, the progress and success of the HPG acquisition.  Although defendants Schulman and Friedson had made numerous positive statements during the road show, in the Registration Statement, and throughout the Class Period, they were fully hedged against a stock price decline in Windmere common shares, and their positive statements were belied by their own inability to obtain profits on their stock if the price of Windmere common stock exceeded $33 (Schulman) and $31 (Friedson).  Indeed, in a fall 1998 meeting with an individual at the Company's Miami Lakes headquarters, defendant Schulman stated that he, defendant Friedson and Desmond Lai had made millions of dollars even though the stock price declined through the use of collars, puts and calls.  Schulman stated, in substance, that:  "I don't care if the stock drops -- we're all going to get rich."  Schulman added, in substance, that "we'll make millions."

117.    Defendants Windmere, Friedson and Schulman also had a motive to commit the fraud herein based on their strong desire to consummate the July Offering.  As alleged above, both Schulman and Friedson told the marketplace it was their desire to enter "the big leagues" by purchasing the brand name and licenses of Black & Decker.  The Company

realized that goal on June 26, 1998 when it acquired HPG. Having purchased HPG, Windmere was obliged to quickly repay NationsBank for the $200+ million bridge loan NationsBank provided Windmere to effectuate the acquisition. Accordingly, defendants were under enormous pressure to successfully sell the July Offering and to conceal harmful material information about the Company and the HPG acquisition.

118.    Scienter is also demonstrated by the sale of Windmere stock by Barbara Friedson Garrett, a Senior Vice President of Windmere, and a member of the Board of Directors. Barbara Friedson Garrett sold 7,000 shares of Windmere common stock on June 2, 1998 at a price of $31.75 per share for proceeds of $222,250. Barbara Friedson Garrett is the wife of defendant David M. Friedson. Barbara Friedson Garrett's sale of Windmere stock was suspicious in both timing and amount. As to timing, the sale was after the public announcement in May 1998 that Windmere would purchase HPG (and a resulting rise in Windmere's stock price on this announcement), but prior to the public announcement of problems with HPG's sales for 1998. As to amount, Windmere's public filings reveal that as of May 12, 1998, Barbara Friedson Garrett had 160,315 shares of Windmere common stock. That figure, however, included ownership of exercisable options to purchase 114,000 shares of common stock. Thus, Barbara Friedson Garrett held only 46,315 shares of Windmere stock (160,315-114,000), the rest being options. The 7,000 shares of stock sold on June 2, 1998 represented approximately 15% of Barbara Friedson Garrett's total common share ownership of Windmere stock.

119.    During the Class Period, defendants individually and via fraudulent scheme, directly and indirectly, participated in a course of business that operated fraud or deceit on purchasers of Windmere common stock and other securities and conspired material

adverse information regarding the then existing business conditions and financial outlook of the Company as specified herein.  Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business as herein alleged to commit a fraud on the integrity of the market for the Company's stock and other securities and to maintain artificially high market prices for the securities of Windmere.  This included the formulation, making of and/or participation in the making of, untrue statements of material facts and the omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaging in acts, practices and a course of business which operated as a fraud and deceit upon plaintiffs and the Class, all in connection with the purchase of Windmere securities by plaintiffs and members of the Class.

120.   By reason of the conduct alleged herein, the defendants knowingly or recklessly, directly and indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Windmere securities.

121.   Plaintiffs and the Class have suffered substantial damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Windmere common stock and other securities as a result of defendants' violations of §10(b) of the Exchange Act and SEC Rule 10b-5.  Plaintiffs and the Class would not have purchased Windmere common

stock and other securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and concealment.  At the time of the purchases by plaintiffs and the Class of Windmere securities the fair and true market value of said common stock was substantially less than the prices paid by them.

## COUNT V

### Against Defendants Friedson and Schulman
### For Violation Of Section 20(a) Of The Exchange Act

122.    Plaintiffs Martin Goldfarb, Performance Exploration Company, Phyllis Preston, Robert J. Walters, and Elizabeth Whitman repeat and reallege ¶¶ 1-73; 97-121 set forth above, as though fully set forth herein.   These plaintiffs assert this Count against defendants Friedson and Schulman.

123.    Friedson and Schulman acted as controlling persons of the Company within the meaning of § 20 of the Exchange Act.  Each controlling person had the power and authority to cause others to engage in the wrongful conduct complained of herein.

124.    By reason of such wrongful conduct, defendants Friedson and Schulman are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

125.    The statutory safe harbor provided by § 27A of the Securities Act and § 21E of the Exchange Act for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Each of the

statements pleaded in ¶¶ 30, 33, 35, 36, 37, 44-45, 53, 55-56, 59-60, 65-67 was either a

misrepresentation of historical fact and/or was not identified as a "forward-looking

statements" when made.  Moreover, the statements were not accompanied by meaningful

cautionary statements identifying important factors that could cause actual results to differ

materially from those in the forward-looking statements accompany those statements.  For

example, the May 11, 1998, June 23, 1998 and August 11, 1998 statements contained the

exact same repetitive boilerplate risk discussion, which stated:

> Certain matters discussed in this news release are forward-looking statements
> that are subject to certain risks and uncertainties that could cause actual results
> to differ materially from those set forth in the forward-looking statements.
> These factors include economic conditions and the retail environment; the
> Company's dependence on the timely development, introduction and customer
> acceptance of products; competitive products and pricing; reliance on key
> customers; dependence on foreign suppliers and supply and manufacturing
> constraints; cancellation or reduction of orders; and other risks and
> uncertainties detailed from time to time in the Company's Securities and
> Exchange Commission filings.

126.    Furthermore, as to those statements pleaded in ¶¶ 44-45, 53, 55-56, 59-60,

65-67, which are found to be forward-looking within the meaning of the statutory safe

harbor, they are statutorily excluded from the protection thereof as each was made in

connection with Windmere's initial public offering of 10% Senior Subordinated Notes.  To

the extent that the statutory safe harbor does apply to any statement pleaded in ¶¶ 30-33, 35,

36, 37, 44-45, 53, 55-56, 59-60, 65, 67, the defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements was made,

the speaker knew the forward-looking statement was false and the forward-looking statement

was authorized and/or approved by an executive officer of Windmere who knew that each

such statement was false when made.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

1. Declaring this action to be a proper class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2. Awarding plaintiffs and the members of the Class compensatory damages;

3. Awarding plaintiffs and the other members of the Class rescission on Counts II and III to the extent they still hold their Windmere securities, or, if said securities have been sold, awarding damages in accordance with § 12 of the Securities Act;

4. Awarding plaintiffs and the members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

5. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 of the Federal Rules of Civil Procedure and any appropriate state law remedies, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the July Offering and any subsequent open market sales in the hands of defendants to assure that plaintiffs have an effective remedy; and

6. Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  June 30, 1999

**MILBERG WEISS BERSHAD**
**HYNES & LERACH LLP**

By:  _____
          Kenneth J. Vianale
          (Member of the Fla. Bar;
          Fla. Bar No.: pending)
          Jack Reise
          (Fla. Bar No. 058149)
          Maya Saxena
          (Fla. Bar No. 095494)

The Plaza, Suite 900
5355 Town Center Road
Boca Raton, FL  33486
Tel:  (561) 361-5000
Fax:  (561) 367-8400

- and -

David J. Bershad
Steven G. Schulman
Salvatore J. Graziano
One Pennsylvania Plaza
New York, NY  10019
Tel:  (212) 594-5300

**Lead Counsel for Plaintiffs**

50

# EXHIBIT A

**Following is an example of a zero-cost collar, using Harry D. Schulman's 12/02/97 transaction data:**

1.      As of 11/07/97, Schulman owned 101,481 Windmere common shares.  The cost basis for these shares was approximately $5.75.

2.      On 12/02/97, Windmere common stock closed at a price of $23.00 per share.

3.      On 12/02/97, Schulman executed a "Zero-Cost Collar" transaction with a bank or brokerage (the Form 4 does not identify the counter party) consisting of the following:

**Purchase of out of the money PUT OPTIONS covering 100,000 Windmere common shares:**

| | |
|---|---|
| Cost of transaction: | $400,000 ($4.00 per option) |
| Exercise Price: | $20.9585 |
| Expiration Date: | 12/03/2001 |

**Sale of out of the money CALL OPTIONS covering 100,000 Windmere common shares:**

| | |
|---|---|
| Proceeds from transaction: | $400,000 ($4.00 per option) |
| Exercise Price: | $33.3008 |
| Expiration Date: | 12/03/2001 |

4.      The transaction is set up by the bank or brokerage so that the cost of buying the put options is exactly offset by the proceeds from the sale of the call options -- thus "Zero-Cost".

5.      Typically, the first parameter that is set in a zero-cost collar is the minimum value to which the stock holder is willing to have his/her underlying security (in this case, Windmere common stock) fall.  The most common level used in zero-cost collar transactions is to about 90% of current market price.  This appears to be the case here (*i.e.* $20.9585 is approximately 90% of the then current market price of $23.00).  Once this lower level is set, the upper bound falls out of the option-value model used.

6.      Schulman gave up the right to appreciation beyond $33.3008 in order to protect value at a minimum of $20.9585 by doing the following.  Schulman bought the right to sell 100,000 Windmere common shares at $20.9585 even if the price of Windmere is below $20.9585 at 12/03/2001.  The bank or brokerage has the right to buy 100,000 shares at $33.3008 even if the price of Windmere is above $33.3008 at 12/03/2001.  Thus, Schulman has locked in a range for value for 100,000 of his Windmere common shares of $20.9585 to $33.3008.  If the price of Windmere is between $20.9585 and $33.3008 at 12/03/2001, neither option with be exercised by either side.

7.      The same explanation applies to Friedson's collaring of 400,000 shares on December 9, 1997 (collars of $20.0561 and $31.867) and 200,000 shares on March 3, 1998 (collars of $24.40 and $34.573).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the annexed "Plaintiffs' Consolidated Amended Class

Action Complaint" was served by Federal Express on the following:


Richard G. Garrett, Esq.
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, FL  33131
Tel:  (305) 579-0717
Fax:  (305) 579-0717

Attorney for Defendants Windmere,
David Friedson and Harry D. Schulman

Gregory Markel
Francis S. Chlapowski
BROBECK, PHLEGER &
 HARRISON LLP
1633 Broadway, 47th Floor
New York, NY  10019
Tel:  (212) 581-1600
Fax:  (212) 586-7878

Parker Thomson
Dennis Campbell
THOMSON, MURARO, RAZOOK
 & HART, P.A.
One S.E. 3rd Avenue, 7th Floor
Miami, FL  33131
Tel:  (305) 350-7200
Fax:  (305) 374-1005

Attorneys for Defendant NationsBanc
Montgomery Securities LLC


Dated:  June 30, 1999

Kenneth J. Vianale